1  Robert A. Rees [State Bar No. 94295]
   REES LAW FIRM P.C.
2  1925 Century Park East, Suite 2000
   Los Angeles, CA 90067
3  Telephone: (310) 277-7071
   Fax: (310) 277-7067
4  E-mail: robertreeslaw@att.net

5  Attorneys for Plaintiff
   Glasswerks LA, Inc.

6

7

                    **UNITED STATES DISTRICT COURT**

8

                    **CENTRAL DISTRICT OF CALIFORNIA**

9

10  | GLASSWERKS LA, INC. | NO.: 2:20-cv-10428-VAP-PD |
11  | | FIRST AMENDED COMPLAINT FOR DAMAGES: |
12  | Plaintiff, | |
    | vs. | 1. BREACH OF CONTRACT |
13  | LIBERTY INSURANCE CORPORATION; | 2. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING |
14  | LIBERTY MUTUAL INSURANCE CORPORATION; DOES 1–10 | |
15  | Defendants. | 3. DECLARATORY RELIEF |
16  | | DEMAND FOR JURY TRIAL |
17

18       Plaintiff Glasswerks LA, Inc. ("GWLA" or "plaintiff") alleges as follows:

19                              PARTIES

20       1.  Plaintiff Glasswerks LA, Inc. ("GWLA" or "plaintiff") is a California corporation with

21  its principal place of business in Los Angeles County, authorized to do business in California

22  and a premium fabricator of architectural, tempered, commercial, laminated, and decorative

23  glass, and other custom glass products.

24       2.  Defendant Liberty Insurance Corporation ("Liberty") purports to be an Illinois

25  corporation with its principal place of business in Massachusetts. Defendant Liberty Mutual

26

27

28  Insurance Company ("LMIC") purports to be a Massachusetts corporation with its principal

place of business in Massachusetts. Defendants are collectively referred to as Liberty Mutual and purport to be insurance companies doing business in California by, among other things, issuing liability insurance policies to individuals and businesses within the County of Los Angeles, State of California.

3.   The amount in controversy, which includes claims for certain attorney's fees that GWLA incurs in bringing this action and claims for punitive damages, is more than the jurisdictional limits of this Court.

4.   Defendants have removed this case to federal court because the parties are citizens of different states, there is complete diversity after citizenship in the amount in controversy exceeds the jurisdictional limit of the court such that jurisdiction is proper under 28 U.S.C. section 1332.

5.   Liberty Mutual issued to GWLA a written policy of commercial general liability insurance no. TB7-Z91-464529 effective 08/24/15 to 08/24/19 (the "Policy"). The Policy was in effect at all relevant times. In the policy, Liberty Mutual agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies" and "to defend the insured against any "suit" seeking those damages." [See Policy at IA1a.]

6.   Plaintiff brings this action against Liberty Mutual for breach of their duties to defend covered claims and their duties of good faith and fair dealing by abandoning plaintiff at a time when it needed the insurance most, when its reputation was on the line and when there was a potential for coverage under the Policy. Liberty Mutual left plaintiff to fend for itself, incur significant legal fees and costs, and settle the Claims.

7.   Plaintiff is unaware of the identity and capacity of each of defendant designated as a

Doe.  Plaintiff is informed and believes and thus alleges that each of the defendants designated as a Doe is in some manner responsible for the damages and injuries as are alleged in this Complaint.  Upon learning the identity, nature and capacity of the Doe defendants, Plaintiff will amend this Complaint to allege their true names and capacities.

8.  Plaintiff is informed and believe that at all material times defendants, and each of them, were the agents, servants, and employees of the other defendants, and each of them.

## FACTUAL BACKGROUND

*The Policy*

9.  As stated above, among other things in the Policy, Liberty Mutual promises to defend and indemnify GWLA for any claims for property damage. The policy also provides:

**"Exclusions**

"This insurance does not apply to:

**"k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**"l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard". This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**"m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**"(1)**     A defect, deficiency, inadequacy or dangerous condition in **"your product"** or

FIRST AMENDED COMPLAINT OF GLASSWERKS LA, INC.
3

**"your work"; or**

"**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its **terms.**

"This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use."

\*\*\*

SECTION V--DEFINITIONS

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate, or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement; if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

    **(a)** You;

    **(b)** Others trading under your name; or

    **(c)** A person or organization whose business or assets you have acquired; And

    **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

10. Under this Policy language, where an insured is a supplier of an allegedly defective

product installed in a work of improvement and the supplied product cannot be removed or replaced without damaging tangible property other than the insured's product, then Liberty Mutual must cover the claim.

*The Claims Against GWLA*

11. Sweig General Construction, Inc. ("Sweig") was the general contractor, hired to build a $20 million home in La Jolla (the "Project"). The architect's design called for about 180 panels of large, heavy, specialized reflective glass, almost all of which were for exterior glass. Sweig subcontracted the glass package to Giroux Glass, Inc. ("Giroux"), who purchased these panels from GWLA. GWLA purchased the required stock sheets from AGC, then fabricated the sheets before delivering the panels to Giroux, who installed the glass.

12. All glass for the project was set directly into the structure. In each panel sequence, the first panel must be placed correctly using a crane. Then the panel is secured into position with plaster and a continuous stainless angle. The next panel then must be measured and fitted, which often requires cutting or polishing or both, to fit correctly with the first panel. Panel sequences can involve ten contiguous panels or more. Each section of glass is then encapsulated in the finishes, which can include stone, tile, porcelain on the exterior band and decks, stone cladding on the walls, stucco, and plaster on the sweeping radius soffits.

13. About six months after installation, some of the panels developed pinkish purple splotches caused by a defect, called polarization, in the stock glass sheets that AGC supplied.

14. To remove the defective panels, the installer had to destroy and remove the exterior finishes such as stucco, stone, porcelain, and tile. The installer also had to destroy and remove interior finishes such as stone flooring, Venetian plaster, shade pockets, drywall, and in some places, large panels of non-defective glass that created interior partitions.

15. Some of the replacement panels were defective and had to be removed and replaced a second time, due to defective replacement blanks from AGC. Ultimately, GWLA bought new panel blanks from a different vendor and fabricated those blanks.

16. In September 2018, Sweig and Giroux made claims on GWLA for damages they allegedly sustained because of the defective glass. Sweig sent a follow-up letter on October 3, 2018 repeating its claims and explaining that the replacement of the defective glass required destruction of stone, tile, drywall, plaster, paint, custom metals and other finishes. On October 15, 2018, Giroux made a separate written demand, in which it confirmed that a part of a major part of the damages were costs attributable to destructive impacts to finishes. (the "*Claims*".)

*Liberty Mutual Wrongfully Refuses to Defend Plaintiff*

17. GWLA tendered the *Claims* to Liberty Mutual timely and asked Liberty Mutual to acknowledge that it would defend and indemnify GWLA on the *Claims*. GWLA forwarded the written demands from Sweig and Giroux.

18. Liberty Mutual hired an independent adjusting service to investigate the claims. On November 30, 2018, Sweig sent an e-mail to the independent adjuster and explained in detail how and why the finishes comprising different types of materials had to be destroyed to replace the allegedly defective panels.

19. On February 7, 2019, Liberty Mutual sent a letter to plaintiff acknowledging that the installer has and will incur labor and equipment costs to destroy and replace the finishes. Liberty Mutual also admitted that "property damage" would exist under the Policy "to the extent 'your product' caused damage to some other property." Liberty Mutual claimed it was unable to determine whether there was coverage under the Policy and asserted Liberty Mutual needed further investigation.

20. On March 23, 2019, GWLA wrote to Liberty Mutual and advised them that "the nature of the claim still represents labor and equipment costs that our customer Giroux will be undergoing to remove, prepare structure and reinstall glass, and the costs that Sweig will undergo for redoing construction work such as tile, drywall, floor stone removal, rebuilding of a BBQ and any electrical or natural gas work required – in addition to other potential claims mentioned in our initial submittal of this claim."

21. On April 26, 2019, Liberty Mutual again wrote to plaintiffs. Liberty Mutual again claimed it needed more time to investigate. However, Liberty Mutual also acknowledge that Sweig and Giroux had confirmed they "needed to remove and replace finishes such as tile, plaster, electrical, drywall and other sections of the structure that need to be redone." Liberty Mutual also acknowledge that the "claim does not include any glass costs from Glasswerks-either when sold or replaced." The Liberty Mutual again acknowledged that under the Policy "property damage" exists where the insured's product causes damage to some other property.

22. On July 10, 2019, GWLA submitted additional documentation of the claim, now more than $1 million, for among other things, "labor, equipment and materials needed to remove and replace finishes such as tile, plaster, electrical, drywall and other sections of the structure that need to be redone."

23. On October 10, 2019 Liberty Mutual notified GWLA in writing that it would not defend the *Claims* because Liberty Mutual believed the claims were not covered. Liberty Mutual acknowledge that Giroux sought recovery of costs "for removal, structure preparation, reinstallation of the glass panels, reconstruction of property that was altered in order to access the removal and reinstallation of the glass panels and delay caused by the removal/reinstallation of the glass panels." However, in the next sentence, Liberty Mutual writes:

"There is no allegation of any covered damage to other property arising from Glasswerks work or product; there are only allegations of damage to the work or product itself." This position is clearly wrong because GWLA is only a supplier of glass panels and Liberty Mutual just acknowledged damage to property other than the glass panels.

24. Liberty Mutual also based its denial on exclusions k, l, and m. However, Liberty Mutual never, in its two prior letters, asserted exclusion l as a basis for denying coverage.

25. On April 14, 2020, plaintiff wrote to Liberty Mutual, explaining that the coverage denial was wrong and that Liberty Mutual must cover GWLA on the *Claims* because the allegations create a potential for coverage sufficient to trigger the duty to defend. GWLA asked Liberty Mutual to reconsider the denial.

26. Liberty Mutual agreed to reexamine its position and reconsider the coverage denial. On May 27, 2020 Liberty Mutual took the position in writing that the *Claims* was not covered because exclusion k. precluded coverage.

27. Once again, Liberty Mutual abandoned plaintiff in its time of need. GWLA had to use its own resources to respond to the *Claims*. GWLA had to pay attorneys' fees and costs and ultimately, GWLA settled with Giroux for over $1,300,000. The settlement was reasonable and made in good faith.

28. GWLA has also been forced to engage coverage counsel to pursue coverage from defendants and those fees and costs continue to accrue as a legal result of defendants' wrongful refusal to defend the *Claims*.

## FIRST CAUSE OF ACTION

## BREACH OF CONTRACT

(As against DEFENDANTS LIBERTY INSURANCE CORPORATION; LIBERTY

MUTUAL INSURANCE COMPANY; and Does 1 through 10)

29. Plaintiff refers to all preceding paragraphs and incorporates them as if set forth in full in this cause of action.

30. Plaintiff GWLA is a covered insured under the written Policy, which was in full force and effect at all relevant times.

31. Plaintiff performed all its obligations under the Policy, except for those obligations which, because of the breach by the defendants, or any of them, of their obligations, plaintiff has been excused or prevented from performing.

32. Liberty Mutual owed duties and obligations to plaintiff under the Policy, including but not limited to the duties to defend plaintiff and to indemnify it against claims for wrongful conduct made against them.

33. Liberty Mutual breached these duties by failing to acknowledge coverage for the Claims against GW and by failing to defend plaintiff against the *Claims*.

34. Defendants have a duty to affirm or deny coverage within a reasonable time after receipt of the claim. As a further legal result of defendants' failure and refusal to take any coverage positions in a timely manner, defendants, and each of them are estopped to assert any grounds for denying coverage to plaintiff.

35. Under California law, an insurer must defend an insured against any claim in which there is a potential for an award of covered damages. Thus, upon the tender of a claim, an insurer has a duty to defend its insured unless and until it can establish conclusively their there is no potential for an award of covered damages. Under California law if there is a claim against an insured and the claim or associated facts are unclear about whether there is or is not coverage, the insurer has a duty to defend the insured.

36.  GWLA was only a supplier of glass panels in connection with the Project. From the beginning, Sweig and Giroux asserted that the allegedly defective glass panels resulted in damage to the encapsulating finishes and tangible property other than the allegedly defective glass panels.

37.  These assertions were potentially covered under the Policy and triggered Liberty Mutual's duty to defend. Liberty Mutual's refusal to defend was a breach of the Policy.

38. As a legal result of defendants' breaches, plaintiff has been damaged because it was required to retain counsel and defend itself against the claims asserted in the *Claims*. Also, since Liberty Mutual wrongfully refused to defend GWLA, it is responsible for the full amount of the reasonable and good faith settlement made by the insured with the claimants. Thus, total damages are in an amount to be proved at time of trial, but not less than $1,300,000.

39. Plaintiff is informed and believes and thereon alleges that defendants' denial of benefits had no reasonable cause.  Thus, plaintiff is entitled to reasonable attorneys' fees and costs incurred in prosecuting this action in an amount to be proved at time of trial.

### SECOND CAUSE OF ACTION

### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

(As against DEFENDANTS LIBERTY INSURANCE CORPORATION; LIBERTY MUTUAL INSURANCE COMPANY; and Does 1 through 10)

40. Plaintiff refers to all preceding paragraphs and incorporate them as if set forth in full in this cause of action.

41. Plaintiff' liability was insured by the Policy, which was valid at the time of the *Claims*. The Policy covered the *Claims*.

42. In the Policy, as in every insurance contract, there exists an implied duty of good faith and fair dealing that the insurance company will not do anything to injure the right of the insured to receive the benefit of the Policy.

43. An insurer breaches the implied covenant of good faith and fair dealing if it fails to affirmatively look for grounds upon which a claim would be covered, before denying coverage for an insured.

44. An insurer breaches the implied covenant of good faith and fair dealing if it refuses, without proper cause, to defend and/or indemnify plaintiff, despite receiving a demand to do so and even though such defense and/or indemnification was a benefit under the Policy.

45. An insurer breaches the implied covenant of good faith and fair dealing if it refuses, without proper cause, to defend and/or indemnify plaintiff even though potential for coverage existed under the Policy.

46. An insurer breaches the implied covenant of good faith and fair dealing if it fails to attempt in good faith to effectuate a prompt, fair and equitable resolution of the claims against Plaintiff.

47. An insurer breaches the implied covenant of good faith and fair dealing if it fails unreasonably withholding benefits from GWLA.

48. An insurer breaches the implied covenant of good faith and fair dealing if it fails to perform a full, fair, and thorough investigation of Plaintiff's claim.

49. An insurer breaches the implied covenant of good faith and fair dealing if it fails to consider Plaintiff's interests at least as much as its own in handling Plaintiff' claim.

50. An insurer breaches the implied covenant of good faith and fair dealing if it fails to diligently search for evidence to support Plaintiff's claim and instead retains coverage counsel

to create ways to deny the claim.

51. Liberty Mutual knew its obligations under the implied covenant of good faith and fair dealing including but not limited to its above duties set forth in the preceding eight paragraphs. Liberty Mutual further knew it had a duty to defend an insured if there was a potential for an award of covered damages and that if a claim against an insured was ambiguous, such that one could not tell if the claimant was seeking covered damages or not, the insurer had a duty to defend its insured.

52. Liberty Mutual knew from the beginning, that Sweig and Giroux asserted the allegedly defective glass panels resulted in damage to the encapsulating finishes and tangible property other than the allegedly defective glass panels. Liberty Mutual even admitted this in its written correspondence.

53. At no time did Liberty Mutual have evidence that conclusively negated the possibility that any alleged defective glass panel caused damage to property other than the panel itself.

54. Liberty Mutual breached its duty of good faith and fair dealing owed to plaintiff because Liberty Mutual denied coverage and refused to defend GWLA even though it knew that knew that Sweig and Giroux were claiming that the allegedly defective GWLA panels caused damage to the finishes, which is property other than the panel itself. Further, Liberty Mutual had no evidence that conclusively negated the possibility that any the allegedly defective panel caused damage only to the panel itself.

55. GWLA is informed and believes that Liberty Mutual breached their duties because it believed that GWLA's liability was reasonably clear and the costs of the claim exceeded $1 million. Liberty Mutual knew that it would lose on the coverage issue but hoped that GWLA would let the matter drop. Apparently, Liberty Mutual decided that the benefit of wrongfully

denying coverage and avoiding payment of the million-dollar claim outweighed the risk of GWLA suing over the wrongful denial. This corporate culture of wrongfully denying coverage for large claims to force the insured to file a lawsuit to obtain uncontroverted policy benefits shows a conscious disregard of GWLA's rights and amounts to malice and oppression.

56.  Plaintiff is informed and believe and, on that basis, allege that Liberty Mutual breached its duties of good faith and fair dealing by other acts or omissions of which plaintiff is presently unaware but which it will show according to proof at trial.

57. The refusal of Defendants, including their agents, and each of them, to carry out their obligations under the Policy to investigate, defend, indemnify and to promptly communicate their coverage position to their insureds were all done with a conscious disregard of the rights of the Plaintiff to receive the benefits due them under the Policy.  These acts were done with the knowledge and approval and ratification of the Defendants and each of them.  These acts continued even after the Plaintiff protested to the Defendants and Plaintiff was powerless to obtain from the defendants' compliance with their obligations.  Plaintiff is thus entitled to recover punitive damages in an amount sufficient to punish and make an example of Defendants.

58. Liberty Mutual's conduct was undertaken by its managers or managing agents, who were responsible for claims supervision, operations, communications, and decisions. This conduct was undertaken on Liberty Mutual's behalf. Liberty Mutual had advance knowledge of the, actions and conduct of said individuals whose actions and conduct it ratified, authorized, and approved.

59. As a direct and proximate result of Liberty Mutual's breaches, plaintiff has suffered

and will continue to suffer damages, including the costs Plaintiff incurred to resolve the Claims against it as well as other general and special damages, of a total amount to be shown at trial, and in any event not less than $1,300,000.

60. As a further proximate result of Liberty Mutual's unreasonable conduct, plaintiff was compelled to retain legal counsel to recover the money spent but that Liberty Mutual should have paid under the Policy. Liberty Mutual therefore is liable to Plaintiff for those attorney fees, witness fees and costs of litigation reasonably incurred to obtain the Policy' benefits.

61. Liberty Mutual intended its conduct to cause injury to Plaintiff. Alternatively, Liberty Mutual engaged in despicable conduct carried out with a willful and conscious disregard of plaintiff's rights or subjected plaintiff to cruel and unjust hardship in conscious disregard of their rights. Liberty Mutual's conduct therefore constitutes malice, oppression, or fraud under California Civil Code section 3294, entitling Plaintiff to punitive damages in an amount appropriate to punish or set an example of Liberty Mutual and deter future similar conduct.

## THIRD CAUSE OF ACTION

## DECLARATORY RELIEF

(As against DEFENDANTS LIBERTY INSURANCE CORPORATION; LIBERTY MUTUAL INSURANCE COMPANY; and Does 1 through 10)

62. Plaintiff refers to all preceding paragraphs and incorporate them as if set forth in full in this cause of action.

63. An actual controversy has arisen and now exists between Plaintiff on the one hand and Defendants on the other relating to Plaintiff's right to defense and indemnity in connection with the *Claims*. Plaintiff desires a declaration of rights and a declaratory judgment is necessary in that Plaintiff contends it was entitled to a defense and indemnity of

the *Claims* by Liberty Mutual, which Defendants deny.  Instead, Defendants failed to accept or deny coverage of the *Claims* within a reasonable time after Plaintiff tendered the defense and indemnity to defendants and failed and refused to defend Plaintiff on the *Claims*.  Thus, Plaintiff ask the Court to declare the respective rights and duties of the parties with respect to the defense and indemnification of Plaintiff for the *Claims*. Plaintiff asks that the Court declare the respective rights and duties of Plaintiff and Defendants.

## **PRAYER**

WHEREFORE, plaintiff pray for judgment against each defendant as follows:

1.  Contractual, consequential, and incidental damages for each defendant's breaches of its contractual duty to pay covered claims, in an amount to be determined at trial, including, but not limited to, attorneys' fees and costs of defense incurred by plaintiff in their defense of the *Claims*; reimbursement of all reasonable and good faith settlements; and attorneys' fees and costs incurred in pursuing and obtaining contractual benefits, including but not limited to the costs of bringing this action, all in a sum of not less than $1,300,000.

2.  General and special damages, including prejudgment interest, for Liberty Mutual's breach of the duty of good faith and fair dealing, in an amount to be determined at trial.

3.  For prejudgment interest in an amount to be proved at time of trial.

4.  For punitive damages for Liberty Mutual's breach of the duty of good faith and fair dealing committed with fraud, malice or oppression, in an amount to be determined at trial.

5.  Attorney fees incurred, pursuant to *Brandt v. Superior Court* (1985) 37 Cal.3d 813, in recovering amounts that should have been paid by Liberty Mutual under the Policy.

6.  On the Third Cause of Action, that the Court declare the respective rights and duties of Plaintiff and Defendants.

7.  For costs of suit herein, prejudgment interest and attorney's fees, as allowed by law.

8.  For such other and further relief as the court may deem just and proper.

DATED:  December 23, 2020          REES LAW FIRM P.C.


By: _____
      Robert A. Rees
      Attorney for Plaintiff
      Glasswerks L A, Inc.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURY DEMAND

Plaintiff Glasswerks LA, Inc. demand a jury trial on all issues which may be tried by a jury.

DATED:  December 23, 2020                REES LAW FIRM P.C.

By: _____
    Robert A. Rees
    Attorney for Plaintiff
    Glasswerks LA, Inc.